In the Matter of MURRAY ENERGY CORPORATION, Respondent, v REORG RESEARCH, INC., Appellant. [58 NYS3d 369]—

Order, Supreme Court, New York County (Carol R. Edmead, J.), entered February 14, 2017, which granted the petition for

pre-action disclosure, unanimously reversed, on the law and the facts, without costs, the petition denied, and the proceeding dismissed. Appeal from interim order, same court and Justice, entered December 15, 2016, unanimously dismissed, without costs, as academic.

Respondent provides subscribers with real-time information about debt-distressed companies via daily emails. The petition alleges that two articles published by respondent about petitioner contain information that was only available to a select group of people, all of whom were bound by confidentiality agreements. Petitioner seeks pre-action disclosure to determine the identities of respondent's sources to facilitate bringing breach of contract actions against them (see CPLR 3102 [c]).

Contrary to respondent's contention, the petition states a cause of action for breach of contract (see Sandals Resorts Intl. Ltd. v Google, Inc., 86 AD3d 32, 38 [1st Dept 2011]).

However, we find that respondent is exempt from having to disclose the names of its confidential sources by New York's Shield Law (see Civil Rights Law § 79-h), because it is a "professional medium or agency which has as one of its main functions the dissemination of news to the public" (id. [b]; [a] [6]).

Petitioner is correct that the audience for respondent's content is not the general public, but rather its relatively limited subscriber base, consisting of 375 unique subscribers with more than 9,000 individual authorized users. In addition, respondent's subscription fees are relatively high, ranging from $30,000 to $120,000 per year, depending on the size of the organization and the number of authorized users. Respondent also places contractual restrictions on further dissemination of its content, although these restrictions are far less broad than petitioner suggests, since limited personal distribution and excerpting of "brief quotations" are expressly permitted.

However, respondent's expert affidavits establish that these features are not uncommon among, and in fact are essential to the economic viability of, specialty or niche publications that target relatively narrow audiences by focusing on a topic not ordinarily covered by the general news media—such as the debt-distressed market. This expert opinion is corroborated by amici, which include several prominent news organizations that "either originally entered the media landscape focused on a particular subset of readers, and/or publish[ ] at least one subscription-only publication or premium-content service on a specialized topic."

Moreover, respondent and amici argue persuasively that the

public benefits secondarily from the information that respondent provides to its limited audience, because that audience is comprised of the people who are most interested in this information and most able to use and benefit from it. More importantly, given the substantial investment required to unearth this information and the limited number of interested readers, the alternative is not broader coverage but no coverage at all.

Significantly, respondent established that its editorial staff is solely responsible for deciding what to report on and that it does not accept compensation for writing about specific topics or permit its subscribers to dictate the content of its reporting. Other courts have found the extent of a publication's independence and editorial control to be important in determining whether to apply the Shield Law (*see e.g. In re Pan Am Corp. v Delta Air Lines, Inc.*, 161 BR 577, 584 [SD NY 1993]; *In re Scott Paper Co. Sec. Litig.*, 145 FRD 366, 370 [ED Pa 1992]; *cf. In re Fitch, Inc.*, 330 F3d 104, 111 [2d Cir 2003] [credit reporting agency not protected by Shield Law where communications with the client "reveal a level of involvement with the client's transactions that is not typical of the relationship between a journalist and the activities upon which the journalist reports"]; *LaSalle Natl. Bank v Duff & Phelps Credit Rating Co.*, 951 F Supp 1071, 1096 [SD NY 1996] [credit reporting agency not protected by Shield Law where, inter alia, its rating "was privately contracted for and intended for use in the private placement Offering Memoranda"]). We concur.

Extending protection to respondent under the Shield Law is consistent with New York's "long tradition, with roots dating back to the colonial era, of providing the utmost protection of freedom of the press"—protection that has been recognized as "the strongest in the nation" (*Matter of Holmes v Winter*, 22 NY3d 300, 307, 310 [2013], *cert denied* 572 US —, 134 S Ct 2664 [2014]). To condition coverage on a fact-intensive inquiry analyzing a publication's number of subscribers, subscription fees, and the extent to which it allows further dissemination of information is unworkable and would create substantial prospective uncertainty, leading to a potential "chilling" effect. Concur—Sweeny, J.P., Mazzarelli, Webber, Kahn and Kern, JJ.